## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:

_____

MAUREEN DIMINO,

                        Plaintiff

v.

PETER T. DAMORE, JR., ESQ.,
LAW OFFICES OF PETER T. DAMORE, JR., P.C., and
MATTHEW BYRNES, ESQ.,

                        Defendants

_____

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

#### Statement of the Case

This is an action for money damages arising from Defendant lawyers' malpractice and interference with Plaintiff's testamentary expectation from her elderly beloved aunt, in that just days prior to her aunt's death in a hospice setting, Defendant's rushed to the hospice at the behest of the aunt's unrelated hairdresser, and while the aunt was under the influence of massive narcotic medication, had her execute a new will leaving her entire estate to the hairdresser, thus causing an expensive will contest and forcing Plaintiff to relinquish a substantial portion of her expected in heritance to her aunt's hairdresser.

#### Parties

1. Plaintiff Maureen Dimino is a natural person who has at all times relevant hereto resided at 176 Kyker Tester Road, Telford, Tennessee.

2.  Defendant Peter T. DaMore, Jr., Esq. is a natural person who at all times relevant hereto has been duly licensed to practice law by the Commonwealth of Massachusetts, with a current place of business at 279 Cambridge Street, Burlington, Massachusetts.

3.  Defendant Law Offices of Peter T. DaMore, Jr., Esq., P.C. is a professional organization duly organized under the laws of the Commonwealth of Massachusetts with a headquarters at 279 Cambridge Street, Burlington, Massachusetts.

4.  Defendant Matthew Byrnes, Esq. is a natural person who at all times relevant hereto has been duly licensed to practice law by the Commonwealth of Massachusetts, with a current place of business at 279 Cambridge Street, Burlington, Massachusetts.

<u>Jurisdiction</u>

5.  Jurisdiction and venue are invoked pursuant to 28 U.S.C. §1332, diversity of citizenship. The asserted rights and interests of Plaintiff exceed $75,000.00, exclusive of interest and costs.  All state claims are pendent to federal claims.

6.  Venue is proper in the Eastern Division of Massachusetts pursuant to 28 U.S.C. § 1391, as the cause of action arose in the Eastern Division of the District of Massachusetts.

<u>Factual Background</u>

7.  Plaintiff Maureen Dimino is the niece of the late Wilhelmina Saracina ("Willie"), and is the daughter of Willie's sister. Throughout Willie's life, Plaintiff and Willie enjoyed a close and loving relationship, more like mother and daughter than aunt and niece.

8.  Willie passed away on or about December 11, 2012, widowed and without issue, leaving Plaintiff as her only close relative.

9.  In 2006, Willie had executed estate plan documents drawn up by attorney Philip Riley ("Attorney Riley") that included a Will leaving the entire estate to Plaintiff, a Power of Attorney naming Plaintiff as agent, and a Health Care Proxy appointing Plaintiff.

10. In August 2012, Willie's health began to decline precipitously, as her cancer returned for the third time.

11. In late 2012, Willie's deteriorating medical condition caused her to move from her home and into a nursing home, Woodbriar Rehabilitation ("Woodbriar").

12. Plaintiff flew to Massachusetts to visit Willie at Woodbriar on or about December 1, 2012, where she would remain for approximately one week.  As Plaintiff entered Willie's room, already present was a stranger to Plaintiff who identified herself as Louise Crocker ("Crocker"), Willie's hairdresser.

13. Willie was under-medicated at Woodbriar; her cancer pain was treated only with Tylenol.

14. Plaintiff observed that Willie's pain caused her to have difficulty eating and sometimes caused her to become doubled-over.  Although Willie was generally conscious, she lacked alertness due to severely distracting pain.

15. During the week of Plaintiff's visit, Willie summoned Attorney Riley to make small amendments to the comprehensive estate planning documents he had drafted for her six years earlier, and he arrived in Willie's room on or about December 4, 2012. Willie, Plaintiff, and Crocker were all in the room, and Attorney Riley had with him the Power of Attorney and a new document, an Unconditional Gift Letter that Crocker filled out. Pursuant to the Unconditional Gift Letter, Crocker's son was gifted Willie's car, Crocker's daughter was gifted some pearls, and Crocker was gifted two air purifiers, a television, and a copier.

3

16. Willie reviewed the Power of Attorney, and said that she wanted to add Crocker to the Power of Attorney because Crocker lived locally and could assist Plaintiff in case something happened to Willie while Plaintiff was at home in Tennessee.

17. Attorney Riley told Willie that he had drafted the Power of Attorney the way she said she wanted it when they had recently spoken on the phone, meaning that Plaintiff was the agent, not Crocker.

18. Attorney Riley said that he would revise the Power of Attorney to include Crocker, and return within a week with that revision.

19. Attorney Riley advised Willie to sign the Power of Attorney naming Plaintiff as her agent just to have something in place while the revisions were in process.

20. Willie executed the Power of Attorney naming Plaintiff as her agent and the Unconditional Gift Letter while seated upright in her bed.

21. Plaintiff told Attorney Riley that she had to return to her home in Tennessee on December 8, 2012.

22. Attorney Riley told Plaintiff to bring the just-executed Power of Attorney to TD Bank where Willie's accounts were held so that she could be added to the signature cards.

23. Plaintiff walked Attorney Riley out of Woodbriar and went to the bank with the Power of Attorney as he directed.

24. A bank employee had Plaintiff sign the signature cards and took a photocopy of the Power of Attorney.

25. Plaintiff was added to all three of Willie's accounts at TD Bank as "ITF", meaning In Trust For, Willie.

4

26. Plaintiff made no attempt to withdraw funds from Willie's accounts at TD Bank.

27. Willie's condition worsened and she was transferred to Winchester Hospital from Woodbriar the day after she signed the Power of Attorney. She had difficulty breathing and was deteriorating quickly.  Plaintiff visited Willie around lunchtime on December 7, 2012 at Winchester Hospital.

28. Crocker's teenage daughter Ariel was in Willie's hospital room at the time of Plaintiff's visit.

29. As of December 7, 2012, Willie was medicated with morphine and Ambien.

30. As of December 7, 2012, Willie was a frail 81 year old with end-stage cancer who was a mere 4'11" tall.

31. Plaintiff observed Willie start laughing and to state, "Oh my god, I am so high on this medicine" from her hospital bed.

32. Plaintiff characterized Willie's laugh from that time as something she had never heard from her aunt before—as if Willie were intoxicated.

33. Willie indicated that she had no pain, she just felt "high."

34. Later on December 7, 2012, Willie executed a revised Estate plan that disinherited Plaintiff and left everything to Crocker, her hairdresser.

35. Willie passed away approximately four days after executing the revised Estate plan.

36. The revised Estate plan began when Defendant DaMore received a phone call on or about December 6, 2012 from a Beverlee Vidoli.

37. Ms. Vidoli is a realtor in the Burlington, MA area.

38. Ms. Vidoli has known Defendant DaMore for at least 15 years.

39. Ms. Vidoli's and Defendant DaMore's offices are about one mile apart.

5

40. Ms. Vidoli is one of the largest sources of client referrals to Defendant DaMore's office for representation in real estate transactions.

41. Defendant DaMore had personally used Ms. Vidoli to sell his house at one time.

42. Ms. Vidoli is a neighbor of Crocker's, which Defendant DaMore knew.

43. Since 1996, Ms. Vidoli and Crocker have been next door neighbors, although they knew each other before then.

44. Ms. Vidoli is also a hairdressing client of Crocker's and formerly worked with Crocker's husband and brother.

45. The children of Ms. Vidoli and Crocker are friends too.

46. Ms. Vidoli knew Willie casually through Crocker.

47. Ms. Vidoli advised Defendant DaMore that Willie needed an attorney to draft a new Power of Attorney that would name Crocker as her agent.

48. Defendant DaMore did not know why Ms. Vidoli was involved in Willie's Estate and Power of Attorney.

49. Defendant DaMore then called Willie at 781-729-9000 on December 6, 2012.

50. 781-729-9000 is the main phone number for Winchester Hospital.

51. A female who answered Willie's bedside phone identified herself as Willie ("the speaker").

52. Defendant DaMore had never before met, known of, or spoken to Willie before attempting to call her on December 6, 2012.

53. Based on the voice of the speaker, Defendant DaMore believed he was talking to someone who was not sickly; who was maybe between 50 – 60 years old; who was having no difficulties communicating or breathing; and who was not taking narcotic pain

medication.  On information and belief, Defendant DaMore was not speaking with Willie during that conversation, as he knew or with reasonable inquiry should have known.

54. Defendant DaMore took notes during the call with the speaker.

55. The speaker said that she needed a new Power of Attorney and to discuss how she wanted her estate distributed.

56. The speaker said that she was in her hospital room with close friends, but that Crocker was not present.

57. The speaker said that she wanted to revise her Power of Attorney because her former attorney Phil Riley and niece Maureen had done "something sneaky" in getting her to sign the then-current Power of Attorney.

58. Defendant DaMore's understanding was that Plaintiff allegedly had presented the current Power of Attorney at the bank and tried to transfer the accounts into her name, which had angered Willie. Nothing of the sort had actually happened, which with reasonable inquiry Defendants should have known.

59. Defendant DaMore gained his "understanding" from an email the bank manager sent to Crocker that was forwarded to Ms. Vidoli, and then sent to him by Ms. Vidoli.

60. The speaker also said that Willie's Estate plan should be revised so that Plaintiff took nothing, and Crocker took Plaintiff's former share.

61. After ending the call with the speaker, Defendant DaMore emailed his associate, Defendant Byrnes, at 6:46pm asking if Byrnes could "do a rush estate plan and possible [sic] have it signed over weekend."

7

62. Defendant DaMore again emailed Defendant Byrnes about drafting an Estate plan and new POA for Willie on the morning of December 7, 2012 with a note that "Beverlee [Vidoli] asked if there was any way you could do it today."

63. Defendant Byrnes emailed Ms. Vidoli—an acquaintance of Willie's at best--on December 7, 2012 to obtain information about Willie, Crocker, and whether Willie wanted a Living Will and new Health Care Proxy.

64. During the day on December 7, 2012, Defendant Byrnes drafted a new Estate plan that eliminated Plaintiff's inheritance, removed her as agent under a new Power of Attorney, removed her as Health Care Proxy, and transferred Plaintiff's former inheritance and powers to Crocker.

65. Defendant Byrnes also knew Ms. Vidoli was a realtor from the Burlington area with whom he had previously attended real estate closings.

66. Defendant Byrnes did not know why Ms. Vidoli was assisting Willie with her Estate plans.

67. Defendant Byrnes never got a written authorization from Willie to speak about her with Ms. Vidoli.

68. Defendant Byrnes traveled to Winchester Hospital in the evening of December 7, 2012 by following Ms. Vidoli's car from his office.

69. Upon his arrival in Willie's hospital room, Defendant Byrnes met and spoke to Willie for a time.

70. Defendant Byrnes failed to make any "sound mind" inquiries of Willie, because as a matter of practice, he does not ask his elderly estate planning clients any such questions.

71.  Defendant Byrnes asked everyone to leave the hospital room so that he could speak to Willie privately.

72. Defendant Byrnes failed to ask Willie whether she was on any medications that day, and failed to make any inquiries of any medical staff at the hospital.

73. Defendant Byrnes failed to inventory Willie's assets or discuss probate versus non-probate assets with her, failed to inquire as to the existence of any prior testamentary bequests, and failed to inquire as to why Willie would make such a radical deathbed alteration of her testamentary intent.

74. Defendant Byrnes failed to ask Willie whether anyone was unduly influencing her to sign the estate plan.

75. Defendant Byrnes failed to inquire as to why Willie was not using her long-time estate planning attorney (Attorney Riley) to carry out her wishes, and failed to contact Attorney Riley, who could have and would have alerted him to Crocker's undue influence over Willie.

76. Defendant Byrnes failed to take any reasonable steps to ensure that Willie had testamentary capacity and was not under any undue influence.

77. Willie lacked testamentary capacity on December 7, 2012 and at the same time was under the undue influence of Crocker and Vidoli, all as Defendants Byrnes and DaMore actually knew or with reasonable inquiry should have known. As such, Willie lacked the capacity to enter into an attorney-client relationship with defendant the Defendants.

78. Willie's December 7, 2012 signatures on the estate plan documents hastily drafted by Defendant Byrnes were markedly shakier and misaligned with the designated signature

lines than Willie's December 4, 2012 signature on the Power of Attorney drafted by

Attorney Riley, which was legible and aligned with the designated signature line.

79. Crocker was in the hospital when Willie executed the December 7, 2012 Will, as the

witnesses to the Will have testified under oath.

80. Also on December 7, 2012, Crocker signed paperwork to admit Willie into hospice

because, upon information and belief, she stated Willie was too weak to sign it.

81. Upon information and belief, Crocker also authored a "to whom it may concern" letter

dated December 7, 2012 to TD Bank purportedly from Willie in which Plaintiff's

surname was misspelled throughout as "Dimina".

82. Defendant Byrnes never spoke to Willie again after leaving her hospital room, and Willie

deceased four days later.

83. Crocker picked up the revised Estate plan with the original signatures from Defendants'

office in the following week.

84. Crocker's friend Ms. Vidoli was the listing broker for the sale of Willie's home following

her death.

85. Plaintiff did not learn of the revised Estate plan until after Willie's death.

86. Defendants billed and Willie's Estate paid $950 for the preparation of her Estate plan.

87. At great expense Plaintiff retained counsel and filed an objection in probate court to

Willie's Will drafted by Defendant Byrnes, that was litigated to the eve of trial, at which

time Plaintiff could no longer afford to fight, and was forced to settle.

88. Crocker took all probate assets from Willie's Estate, including half of the sale proceeds

from Willie's home.  Plaintiff took the other half of the sale proceeds from Willie's home

by settlement agreement.

89. Crocker removed all valuables from Willie's home for herself prior to the sale.

## COUNTS

### COUNT ONE
### Tortious Interference with the Expectancy of Receiving a Gift or Legacy
(Against all Defendants)

90. The Plaintiff repeats and realleges the allegations in the preceding paragraphs 1-89 as if fully set forth herein.

91. As outlined above, Defendants intentionally interfered with Plaintiff's expectancy in an unlawful way.

92. Plaintiff, an heir, had a legally protected interest in Willie's Estate.

93. Defendants' interference acted continuously until the time that the expectancy would have been realized.

94. Defendants DaMore and Byrnes' conduct is the direct and proximate cause of economic harm to Plaintiff, consisting of the difference between what she would have received from Willie's Estate but for Defendants' tortious interference, and what she did receive plus fees and expenses for the probate litigation.

95. Defendant Law Offices of Peter T. DaMore, Jr., P.C. is directly and vicariously liable for the damages suffered by Plaintiff.

WHEREFORE, Plaintiff demands judgment against the Defendants jointly and severally in an amount sufficient to compensate her for her losses to be proven at trial, together with interest, costs, and such further relief as is just and proper.

<u>COUNT TWO</u>
<u>Legal Malpractice</u>
(Against All Defendants)

96. The Plaintiff repeats and realleges the allegations in the preceding paragraphs 1-95 as if fully set forth herein.

97. There was no valid attorney-client relationship between Willie and any of the Defendants because Willie lacked mental capacity to enter into such an arrangement.

98. The defendants owed the Plaintiff a duty of care, consistent with that of the ordinary qualified practitioner of elder care estate planning law to refrain from harming her interests, of which they were well aware, by, *inter alia*, taking reasonable steps that would have demonstrated to the average qualified practitioner of elder care estate planning law that Willie did not have the mental capacity to make drastic death-bed changes to her Will.

99. As a direct proximate result of Defendants' departures from the standard of care, the Plaintiff suffered damages consisting of the difference between what she would have received from Willie's Estate but for Defendants' tortious interference, and what she did receive plus fees and expenses for the probate litigation.

100. Defendant Law Offices of Peter T. DaMore, Jr., P.C. is directly and vicariously liable for the damages suffered by Plaintiff.

WHEREFORE, Plaintiff demands judgment against the Defendants jointly and severally in an amount sufficient to compensate her for her losses to be proven at trial, together with interest, costs, and such further relief as is just and proper.

COUNT THREE
Civil Conspiracy
(Against All Defendants)

101. The Plaintiff repeats and realleges the allegations in the preceding paragraphs 1-100 as if fully set forth herein.

102. As described above, Defendants engaged in a concerted action to commit the tort of interfering with Plaintiff's testamentary expectation.

103. As described above, Defendants engaged in a concerted action to commit the tort of legal malpractice against Plaintiff.

104. Alternatively, as described above, the Defendants combined to accomplish an unlawful purpose—that is, to deny Plaintiff of her testamentary expectancy—through some peculiar power of coercion over the Plaintiff that they would not have had if they acted individually.

WHEREFORE, Plaintiff demands judgment against the Defendants jointly and severally in an amount sufficient to compensate her for her losses to be proven at trial, together with interest, costs, and such further relief as is just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Dated: July 21, 2016

Respectfully submitted,
PLAINTIFF,

By her attorneys,

*/s/ Charles P. Kazarian, Esq.*
Charles P. Kazarian, Esq. (BBO#: 262660)
Christopher S. Malloy, Esq. (BBO# 659791)
KAZARIAN LAW
One International Place, 8th Floor
Boston, MA  02110
(617) 951-0100
cpk@kazarianlaw.com
csm@kazarianlaw.com

13